1
2
3
4
5
6
7

8         UNITED STATES DISTRICT COURT

9         EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| THE ESTATE OF JAMES BARRICK and PAMELA TAYLOR, individually and as successor in interest to the Estate of James Barrick, | No. 2:18-cv-02216-MCE-DB |
| Plaintiffs, | **MEMORANDUM AND ORDER** |
| v. | |
| THE COUNTY OF SAN JOAQUIN, THE SAN JOAQUIN COUNTY SHERIFF'S OFFICE, CINDY BORGES and JOHNNIE MORRIS, | |
| Defendants. | |

By way of this action, The Estate of James Barrick and Pamela Taylor, individually and as successor in interest to the Estate (collectively "Plaintiffs" unless otherwise indicated) seek redress from the County of San Joaquin, the San Joaquin County Sheriff's Office, Cindy Borges and Johnnie Morris ("Defendants") as a result of the suicide of James Barrick ("Decedent") when he was in Defendants' custody. Plaintiffs allege Defendants are liable on various grounds, including constitutional deprivations under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, negligence, violations of the California Government Code, and entity/supervisorial liability on grounds that the omissions that led to Decedent's death were the result of a

1

1    custom, policy or repeated practice on the part of the County and Sheriff's Department.

2    Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 29),

3    which for the reasons outlined below, is GRANTED.[1]

4

5                                      **BACKGROUND**

6

7         On September 6, 2017, Decedent, was arrested by the San Joaquin County

8    Sheriff's Office on multiple felony and misdemeanor charges apparently stemming from

9    his operation of a stolen vehicle while under the influence.  He was processed into the

10   San Joaquin County Jail ("Jail") as a pretrial detainee.  Defs' Statement of Undisputed

11   Fact, ("UF"), Nos. 1, 2.   Philip Featherston, a correctional officer assigned to pre-

12   booking at the Jail, completed a Medical Screen Questionnaire at 4:47 p.m.  Decl. of

13   Philip Featherston, ECF No. 29-6, Ex E.   Decedent denied suicide attempts in the past

14   five years and further denied any present suicidal ideations.  Although Featherston

15   thought he was under the influence, Decedent was nonetheless described as alert,

16   responsive and not confused.  Id.

17        In an initial medical evaluation prepared later that afternoon, Decedent again

18   denied any present suicidal ideation or past suicide attempts over the same time period.

19   Decl. of Cindy Borges, ECF No. 29-3, ¶ 6, Ex. G.  He was again described as alert and

20   oriented.  Thereafter, at 6:30 p.m., Jail staff prepared an "ETOH [Alcohol] Withdrawal

21   Assessment" which indicated that Decedent had last consumed alcohol some four hours

22   beforehand at 2:30 p.m.  Borges Decl., ¶ 12, Ex. I.

23        Because Decedent recounted a thirty-year history of drinking up to 30 beers each

24   day, he was placed on an alcohol withdrawal protocol and put into medical housing for

25   three days so that he could be properly medicated and monitored.  At no point prior to

26   ///

27   ───────────────────────

28        [1] Because oral argument would not have been of material assistance, the Court ordered this
     matter submitted on the briefs.  E.D. Cal. Local Rule 230(g).

2

1  September 9, 2021, when Decedent was released into the general population, did he

2  express any suicidal thoughts to Jail staff.  Id. at ¶¶ 10-13.

3       Decedent also underwent a mental health evaluation and suicide risk screening

4  on the day he was booked into the Jail.  Borges Decl., ¶ 9.  Fong Vang, a Senior

5  Psychiatric Technician employed by the County and working at the Jail, prepared the

6  assessment at 7:20 p.m., nearly three hours after Decedent had initially been booked

7  and about five hours following his last drink.  Vang Decl., ECF No. 29-9, Ex. I.  While

8  Decedent recounted a history of post-traumatic stress and bipolar disorders, he

9  specifically denied yet again any current suicidal ideation or history of suicide attempts.

10  Id.  Mr. Vang described Decedent as "alert and oriented" (id.) and "did not believe

11  Mr. Barrick was at-risk for suicide."  Vang Decl., ¶ 6.

12       On September 21, 2017, after being housed at the Jail for about two weeks and

13  not having sought any further care, Decedent used a computer "kiosk" available at all

14  times for inmates to request medical or psychiatric attention.  UF Nos. 17, 18.  He asked

15  to "speak with a psychologist or psychiatrist regarding my mental health issues that I

16  have been dealing with since childhood."  Id. at No. 19.  Decedent was evaluated by a

17  Psychiatric Licensed Vocational Nurse, Navjot Dhami, the very next day, September 22,

18  2017.  Id. at No. 20.  Decedent again denied current suicidal ideation of any kind and

19  "firmly contracted for [his] life and safety," stating that he "had to live for his family and

20  his dog."   Dhami Decl., ECF No. 29-4, ¶¶ 9-15, 18, Ex. F.  Ms. Dhami accordingly

21  cleared Decedent to remain in the general population and ordered a referral to a Jail

22  mental health clinician for "stress/depression."  UF Nos. 23-24.  Because, according to

23  Dhami, the referral for further treatment was not suicide related (Dhami Decl., ¶¶ 19-20),

24  the follow-up care she recommended would likely not commence until between seven

25  and ten business days following her request.  Borges Dep., 31:17-22.

26       It is undisputed that Decedent never reported any suicidal ideation to any Jail staff

27  (whether healthcare or custodial) at any time between the time after he was booked into

28  the Jail on September 6, 2017 and the time of his death.  UF Nos. 31-32.  On October 1,

2017, however, at approximately 4:05 a.m. he was found hanging in his cell by correctional officer Johnnie Morris, who was assigned to monitor the Housing Unit 5 area where Decedent was housed, after two inmates reported that Decedent was not getting up as directed in preparation for a formal inmate count.  Id. at Nos. 56-57.  Decedent used a bedsheet to suspend himself from a ventilation grill in his cell located behind the cell door and accompanying window.  Id. at No. 58.  Morris took Decedent down, called for assistance, and employed emergency first aid.  Id. at 59-60.  Decedent was taken by ambulance to the San Joaquin County General Hospital where he was later pronounced dead.

Morris never spoke to Decedent, and at no time did Decedent ever report any suicidal thoughts to Morris.  Id. at Nos. 63-64.  At the time of Decedent's suicide, correctional officers were mandated by County policy to perform both informal and formal counts of inmates at the Jail throughout the day.  Id. at No. 67.  For purposes of the time period involved here, informal checks were required at 11:30 a.m. and 2:00 a.m.  County Custody Division Policy 3.1.0, Ex. M to the Decl of Michael Tibon, ECF No. 29-7, p. 4.  A formal count was mandated after prisoners arose for breakfast at 4:00 a.m., typically between 4:30 and 5:00 a.m.  Id.  In addition, general welfare checks were performed on an hourly basis.  Tibon Decl., ¶ 26.  All of these checks are verified through use of a pipe-like device that, when engaged with electronic portals located throughout the cellblock area, signifies that the required checks have been made.  UF Nos. 41-43.

Defendant Morris began working at Housing Unit 5 at 12:00 a.m. the morning of the incident.  UF 38.  The electronic records generated by the "pipe" show that he performed welfare checks on the inmates housed in that area at 12:22 a.m (soon after he started his shift), and at 1:00 a.m., 3:04 a.m., and 3:49 a.m.  See Tibon Decl., ¶ 27.  The only informal count that Morris did on his shift (which would have ended at

///

///

1  6:00 a.m.) was at 2:00 a.m.,[2] and the records show that count as being performed at

2  2:01 a.m that morning.[3]  Id.  At deposition, Morris opined that he specifically recalls

3  seeking Decedent's skin/movement at the time of his informal count at 2:01 a.m., as

4  required by County policy for an informal count.  Morris Dep., 22:14-17.  While Lt. Tibon

5  characterized Morris' final 3:49 a.m. check on Decedent, performed some 15 minutes

6  before Decedent was found hanging, as a welfare check (Tibon Decl., ¶ 27), Morris

7  himself testified at deposition he did that round as a precursor to the 4:00 a.m. "formal"

8  check that never occurred given Decedent's demise.[4]  At any rate, the parties agree that

9  the 3:49 a.m. check was not an informal count requiring Morris under County policy to

10  affirmatively see Decedent's skin or movement/breathing.  Significantly, once Morris did

11  enter Decedent's cell after being alerted by other inmates at 4:05 a.m. and found

12  Decedent hanging behind the door, Morris saw that the blankets on his bed had

13  apparently been purposely arranged in a way that made it appear that Decedent

14  remained sleeping.  Morris Dep., 29:8-15.

15       Decedent's mother, Plaintiff Pamela Taylor, instituted the present action on

16  August 14, 2018, both individually and on behalf of her son's estate.  According to the

17  operative First Amended Complaint (ECF No. 24, hereinafter "FAC"), Taylor called Jail

18  employees repeatedly to alert them to Decedent's mental health issues, including

19  depression, as well as the fact that he posed a suicide risk.  FAC, ¶¶ 13-15.  Plaintiffs

20

21      [2] Morris unequivocally testified that the only informal count on his shift was at 2:00 a.m., stating that "informal count for me" is 2:00 a.m. which is consistent with that required at the Jail between

22  12:00 a.m. and 6:00 a.m.  Morris Dep., 12:10-11.  The previous 11:30 p.m. informal count would have been before Morris' shift began.

23

24      [3] An "informal" count entails checking to ensure that a correctional officer can detect either an inmate's skin or movement/breathing, whereas a "formal" count, as would have been employed at 4:00 a.m., would compare each inmate's face with his or her cell placement.  Tibon Decl., ¶¶ 25, 28-29;

25  Ex. M (County Custody Division Policy 3.1.0).  The record does not reflect any particular requirements associated with a general "welfare check" as opposed to either a formal or informal count.

26      [4] Morris testified that he counted the inmates just prior to 4:00 a.m. because that logistically made

27  the remainder of the "formal" count procedure, which required several overlapping forms of record-keeping that could be difficult to perform simultaneously, easier.  Morris Dep., 18:8-25.  At any rate, contrary to Plaintiffs' inferences otherwise, the 3:49 a.m. check was not an "informal count" requiring that Morris

28  observe inmates' skin or movement.

1   allege that the Jail's failure to do anything in response was in violation of its own policy,

2   and they aver that any treatment that was provided was "deficient" and "did not

3   adequately address [Decedent's] suicidal tendencies." Id. at ¶ 17.  Cindy Borges is one

4   of two named individual defendants, and although it is undisputed that she never herself

5   provided any treatment to Decedent, as the Jail's Chief Medical Health Clinician she did

6   supervise its provision of mental health services.  In addition, Plaintiffs sued correctional

7   officer Johnnie Morris on grounds that he did not properly monitor Decedent on the

8   morning of his suicide, alleging that if he had complied with the Jail's policy for

9   conducting welfare checks Decedent's death could have been averted. Id. at ¶ 18.

10  Defendants now move for summary judgment on grounds that Plaintiffs have not

11  demonstrated a viable cause of action.

12

13  **STANDARD**

14

15  The Federal Rules of Civil Procedure provide for summary judgment when "the

16  movant shows that there is no genuine dispute as to any material fact and the movant is

17  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

18  Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

19  dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

20  Rule 56 also allows a court to grant summary judgment on part of a claim or

21  defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

22  move for summary judgment, identifying each claim or defense—or the part of each

23  claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

24  Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

25  motion for partial summary judgment is the same as that which applies to a motion for

26  summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

27  Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

28  judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Id. 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Plaintiffs seek relief through four state and federal causes of action: (1) a 42 U.S.C. § 1983 ("§ 1983") claim against Borges and Morris based on alleged cruel and unusual punishment under the Fourteenth Amendment; (2) a common law claim based on negligence against all Defendants; (3) a claim under California Government Code §§ 944.6 and 845.6 against Borges, Morris and the Sheriff's Department for failure to monitor, care for, and respond to persons under their control; and (4) a claim for municipal liability against the entity defendants under § 1983 alleging a custom, practice or repeated practice of permitting the acts and omissions which Plaintiffs allege led to Decedent's demise.

**A.    Cruel and Unusual Punishment under § 1983**

Section 1983 permits an individual to sue "[e]very person who, under color of [law] subjects" him "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  As opposed to prisoner claims, which are governed by the Eighth Amendment, a pretrial detainee is entitled to be free from cruel and unusual punishment under the due process clause of the Fourteenth Amendment.  Lolli v. County of Orange, 353 F.3d 410, 418-19 (9th Cir. 2003).  As indicated above, in their First

8

1  Cause of Action Plaintiffs allege that Defendants Borges and Morris failed to provide

2  adequate mental health and custodial care to Decedent, which they claim amounts to

3  cruel and unusual punishment in violation of the Fourteenth Amendment.  FAC, ¶ 23.

4         The Due Process Clause requires that "persons in custody ha[ve] the established

5  right to not have officials remain deliberately indifferent to their serious medical needs."

6  Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996).  To establish a claim for the violation

7  of this right, a pretrial detainee must first show a "serious medical need."  Id.  A pretrial

8  detainee may establish this element by showing he suffered from a serious injury while

9  confined or maintained a heightened risk of suicide.  See Clouthier v. Cnty. of Contra

10  Costa, 591 F.3d 1232, 1240 (9th Cir. 2010), overruled on other grounds by Castro v.

11  Cnty. of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) ("We have long analyzed claims that

12  correction facility officials violated pretrial detainees' constitutional rights by failing to

13  address their medical needs (including suicide prevention) . . . ").

14         Second, a pretrial detainee must show the defendant officials were deliberately

15  indifferent to that serious medical need.  Conn v. City of Reno, 591 F.3d 1081, 1095

16  (9th Cir. 2010), cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn,

17  563 U.S. 915 (2011), and opinion reinstated, 658 F.3d 897 (9th Cir. 2011).  In Castro v.

18  County of Los Angeles, the Ninth Circuit held that an objective deliberate indifference

19  standard applies to pretrial detainees' Fourteenth Amendment failure to protect claims,

20  instead of the partially subjective standard applied in prior case law.  833 F.3d 1060

21  (9th Cir. 2016) (overruling Clouthier v. County of Contra Costa and implying a failure to

22  prevent suicide case should be analyzed under an objective deliberate indifference

23  standard); see also Gordon v. Cnty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018)

24  (applying the objective deliberate indifference standard to claims for violations of the

25  right to adequate medical care and stating the "Supreme Court has treated medical care

26  claims substantially the same as other conditions of confinement violations including

27  failure-to-protect claims"); Horton by Horton v. City of Santa Maria, 915 F.3d 592, 599-

28  603 (9th Cir. 2019) (stating the objective standard would apply because the case

involved a pretrial detainee's Fourteenth Amendment claim for violation of the right to adequate medical care, but finding the case law at the time too sparse to "establish a reasonable officer would [have] perceive[d] a substantial risk" that the decedent would attempt suicide).

"Deliberate indifference is a high legal standard."  Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Mere negligence is insufficient for liability."  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  In order to demonstrate deliberate indifference, a pretrial detainee must show: "(1) [t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) [t]hose conditions put the plaintiff at substantial risk of suffering serious harm; (3) [t]he defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) [b]y not taking such measures, the defendant caused the plaintiff's injuries.  Castro, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn[ ] on the facts and circumstances of each particular case."  Id. (internal citations and quotation marks omitted).

Both supervisors and non-supervisor officials may be liable for acting or failing to act in a manner that is deliberately indifferent.  "A supervisor may be held liable under § 1983 if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation."  Cunningham v. Gates, 229 F.3d 1271, 1292 (9th Cir. 2000), as amended (Oct. 31, 2000).  "The requisite causal connection can be established . . . by setting in motion a series of acts by others . . . or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury."  Starr v. Baca, 652 F.3d 1202, 1207-08 (9th Cir. 2011) (internal quotation marks omitted).  For example, supervisors may be held liable for: "their own culpable action or inaction in the training, supervision, or

1   control of subordinates; 2) their acquiescence in the constitutional deprivation of which a

2   complaint is made; or 3) for conduct that showed a reckless . . . indifference to the rights

3   of others." Id.

4       Given the above, the key to establishing any potential liability under the First

5   Cause of Action is whether the facts and evidence before this Court are sufficient to

6   demonstrate that either Cindy Borges or Johnnie Morris were "deliberately indifferent" to

7   Decedent's serious medical needs so as to survive summary judgment on that issue.

8       First, with respect to Cindy Borges, it is undisputed that she never provided any

9   mental health treatment to Decedent directly, or had any contact with him, so as to be

10  liable for any shortcoming or omission on that basis. UF No. 34. Nor is there any evidence

11  that she interfered with any treatment decision by any of the mental health staff that

12  worked at the Jail under her supervision.  In addition, and at any rate, Decedent's intake

13  process on September 6, 2017, documents three separate instances, spanning over a

14  period of nearly three hours, where Decedent consistently denied current suicidal ideation

15  or any history thereof.  Id. at Nos. 4-7.  That itself belies any claim that Jail staff were

16  deliberately indifferent in failing to provide suicide-related mental health care following

17  Decedent's booking when no notice of any such proclivity on his part had been provided.[5]

18      There is also no evidence that Decedent expressed any suicidal thoughts while

19  being medically monitored for alcohol withdrawal symptoms between September 6

20  and 9, 2017.  Then, when Decedent did request mental health assistance through a

21  healthcare kiosk on September 21, 2017, for "mental health issues [he had] been

22  dealing with since childhood," he indicated nothing about suicide.  UF No. 19.  Finally,

23  when he was evaluated the next day in response to his request, Decedent again denied

24

25      [5] The Court is unpersuaded by Plaintiffs' inference that Decedent's alcohol use prevented him
from providing accurate information on the day he was arrested and booked into the Jail.  Decedent was

26  described as alert and oriented, even if still under the influence, in two separate evaluations that day, one
occurring nearly five hours after consuming his last drink.  Moreover, and at any rate, whether Decedent

27  was cognitively impaired during the booking process due to alcohol calls for expert opinion, and no such
evidence (or any evidence that he was incapable of providing accurate responses) has been provided

28  beyond mere speculation, and speculation alone cannot defeat summary judgment.  See Nelson v. Pima
Comm. College, 84 F.3d 1075, 1082 (9th Cir. 1996).

considering suicide, and according to the nurse's note, "firmly contracted for [his] life and

safety."  Dhami Decl, Ex. F.  It was not unreasonable, let alone deliberately indifferent,

for the nurse to simply make a clinical referral for "stress/depression" follow-up care

given what Decedent told her (as well as her own conclusion that Decedent was not

suicidal).  Id. at ¶¶ 19, 20.

      While follow-up treatment was not provided prior to Decedent's suicide some

nine days later, Cindy Borges testified that a non-emergency referral for care by a

mental health clinician could take between seven and ten business days to process.

Again, none of this evinces deliberate indifference.  Borges Dep., 31:17-22.  During the

22 days Decedent was housed at the Jail, he was provided two mental health

evaluations and denied on four separate occasions having any suicidal ideations.  UF

Nos. 81-82.  There was no notice of Decedent's risk of suicide, let alone knowledge that

care was needed in the face of such notice, as deliberate indifference requires.  As the

unrebutted declaration of Defendants' psychiatric expert, Dr. Stuart Pickel, indicates,

"[w]ithout having some indication from Decedent, either verbally or behavioral (sic), that

he had suicidal ideation and/or intent, the jail personnel could not reasonably be

expected to know that he was intending to commit suicide."  Pickel Decl, ECF No. 29-5,

¶ 7.

      Plaintiff Pamela Taylor's claim that she tried to call the Jail on many occasions to

report the fact that she believed her son to be suicidal presents a slightly closer

question.  It is undisputed, however, that Cindy Borges called Ms. Taylor back and left a

message on September 14, 2017.  UF No. 28.[6]  While Taylor claims she actually spoke

---

[6] Plaintiffs offer an exhibit what they allege to be cellphone records from Ms. Taylor suggesting she may have called the Jail more than 40 times between September 8, 2017 and September 23, 2017. Decl. of Jeffrey Eisinger, ECF No. 31-3, Ex. 1.  The defense objects to those records as lacking proper foundation and constituting hearsay, and the Court agrees.  The records were not authenticated by Ms. Taylor at her deposition, and calls placed to an area code (209) corresponding with the Jail's location in Stockton are simply circled without even establishing that the phone numbers in question belong to the Jail. The Court is also left to speculate as to whether the calls were even made by Ms. Taylor, let alone whether they were made to alert Jail personnel to his mental health condition given Ms. Taylor's testimony that she also spoke to her son two or three times while incarcerated at the Jail (Taylor Dep., 48:18-23) and may well have attempted to call him on additional occasions.  Defendants' objections to the telephone records are accordingly SUSTAINED.

1   to someone at the Jail on four or five occasions and at one time even reached someone

2   in mental health, she conceded at deposition that she never spoke to anyone after

3   Decedent was seen for an additional mental health evaluation on September 22, 2017,

4   and she was aware from both a phone call from her son as well as a letter that he had

5   requested mental health care on September 21, 2017, and been seen by someone

6   thereafter.  Taylor Dep., 82:21-83:16, 88:11-17, 97:13-6.  Even if Taylor had warned the

7   Jail that Decedent had told her in the past that he had been suicidal, the fact remains

8   that at the time of his additional evaluation <u>after</u> his mother had made the calls she

9   alleges, Decedent specifically denied being suicidal, causing the psychiatric nurse

10  Dhami to conclude he did not pose a present risk of suicide.  There is no suggestion that

11  any further follow-up would have been provided had Jail personnel in fact been warned

12  by Ms. Taylor, and consequently there is no triable issue in that regard.[7]

13          The second individual named by Plaintiffs in their First Cause of Action as being

14  deliberately indifferent to Decedent's medical needs is, as indicated above, correctional

15  officer Johnnie Morris.  It is undisputed, however, that Decedent never reported any

16  suicidal thoughts to Morris and that Morris had no knowledge of such thoughts

17  otherwise.  UF Nos. 64, 65.  Plaintiffs allege that Morris' failure to conduct adequate

18  safety checks on Decedent the night he committed suicide allowed him to do so.  Jail

19  policy required that a combination of formal and informal counts be provided, as well as

20  a more cursory welfare check to occur on an hourly basis.  During the hours preceding

21  Decedent's suicide, an informal count was required pursuant to the Jail's policy at

22  2:00 a.m.  UF No. 44.  As indicated above, informal counts conducted during nighttime

23  hours (at 11:30 p.m. and 2:00 a.m.) entail not only a count of inmates but also visual

24  confirmation of each inmate's well-being through the officer's observation of either an

25  inmate's skin or movement.  UF No. 49, Tibon Decl, Ex. M.  Jail records, which as

26  _____

27          [7] The Court recognizes Ms. Taylor's deposition testimony that she did at some point speak with an
    unidentified individual at the Jail who allegedly stated they were "aware" of Decedent's problems and "on"
    the situation.  Taylor Dep., 89:5-8.  Not only is that claim too vague to present any real triable issue, as
    indicated above it also occurred before Decedent's second mental health evaluation and the information

28  he provided as outlined above.

indicated above were generated automatically through electronic portals corresponding

with given cells that were triggered through staff's insertion of a pipe-like tool into each

portal, show that Morris, whose responsibility on the evening in question included the cell

occupied by Decedent, in fact conducted a check at 2:01 a.m. corresponding with the

time requirement for performing an informal count.  Tibon Decl., ¶ 27.  Morris testified

that he saw Decedent's skin at the time of that count.  Morris Dep., 22:14-17.  In

addition, the records reflect additional hourly welfare checks at 1:00 a.m. and 3:04 a.m.,

and 3:49 a.m. and further reflect that Morris also checked Decedent's cell at 12:22 a.m.,

shortly after he began working that morning on Housing Unit 5.  Tibon Decl., ¶ 27.

Therefore, during the four hours before Decedent's suicide Morris had checked on his

cell a total of five occasions.  He did so in accordance with County policy and Plaintiffs

have not demonstrated the high bar required to show deliberate indifference.

It is undisputed that a formal count was then to occur between 4:30 and

5:00 a.m., after inmates arose for the day.  UF No. 52.  As indicated above, that entailed

both a count and a facial check of each inmate against their photo identification.  UF

No. 55.  Morris testified that because of the multiple steps required, he did the "count"

portion of the procedure at about 3:49 a.m. according to computer generated records.   It

was only after the inmates had been awoken at 4:00 a.m., less than fifteen minutes later,

that a neighboring cellmate tried to rouse Decedent and discovered him hanging from a

sheet draped through a ventilation grate in the ceiling (located behind the cell door) and

alerted custodial staff.  When Morris responded, he observed the blankets on

Decedent's bed arranged in such a way to make it look like Decedent remained there.

Morris Dep., 29:8-15.

Even if Decedent thereby "fooled" Morris into thinking he was still in bed at the

time of his last 3:49 a.m. check, that does not mean that Morris was deliberately

indifferent in drawing the conclusion he did.  Additionally, after responding immediately

to Decedent's cell after being told that he was hanging, Morris cut Decedent down, and

with the help of another correctional officer tried to administer first aid before Decedent

1    was taken to the San Joaquin General Hospital and later pronounced dead.  UF

2    Nos. 59-62.  Again, none of this suggests deliberate indifference on Morris' part.

3         Because Plaintiffs have not shown any genuine issue of triable fact that either

4    Cindy Borges or Johnnie Morris were deliberately indifferent to Decedent's health care

5    needs, summary judgment as to the First Cause of Action is granted in their favor as

6    requested.

7         **B.    Negligence**

8         Plaintiffs' Second Cause of Action alleges negligence against not only Defendants

9    Borges and Morris, but the San Joaquin County Sheriff's Department as well.  Plaintiffs

10   assert that Defendants had a duty to monitor Decedent and failed to do so despite

11   having "had access to information pertaining to the mental problems experienced by

12   Barrick and his history of suicide attempts, particularly via his mother."  FAC, ¶ 25.

13   They allege that Defendants were negligent by "ignoring his mental health needs, failing

14   to house him in a suicide-proof cell, and failing to follow department policy as far as

15   welfare checks on inmates during the night hours."  Id.  Plaintiffs point to no other actions

16   as constituting negligence.

17        In California, a plaintiff must prove the following elements for a negligence claim:

18   (1) a legal duty to use due care; (2) a breach of that duty; (3) causation; and

19   (4) damages.  A negligent act "is not the proximate cause of [a decedent's] alleged

20   injuries if another cause intervenes and supersedes . . . liability for the subsequent

21   events."  Campos v. County of Kern, No. 1:14-cv-01099-DAD-JLT, 2017 WL 915294

22   at *14  (E.D. Cal. 2017) (internal citations omitted).

23        Defendants move for summary judgment on Plaintiffs' negligence claim on

24   causation grounds, arguing there is no evidence that any shortcoming or omission on

25   the part of the Jail or its staff contributed to Decedent's suicide.  Defendants point to the

26   undisputed fact that Decedent never told anyone at the Jail that he was suicidal, despite

27   being specifically questioned on that topic three times during his intake process on

28   September 6, 2017, and then yet again on September 22, 2017, after Decedent

1   requested mental health care for "issues" he had experienced since childhood.  UF

2   No. 19.  Importantly, Decedent neither indicated on the evaluation request that he was

3   suicidal or told the clinician who assessed him the next day that he was considering

4   suicide.  Id., see also Dhami Decl, Ex F.  Indeed, according to notes prepared as a result

5   of the evaluation, Decedent "firmly contracted for [his] life and safety."  Dhami Decl, ¶¶ 9-

6   15, 18.

7         In addition, while Plaintiffs suggest that Defendant Borges was negligent for not

8   talking to Decedent's mother, who alleges she would have told Borges of her son's

9   suicidality, Borges did attempt to return at least one of Ms. Taylor's calls.  More

10   importantly, however, all of the calls that Pamela Taylor does claim to have made were

11   apparently placed before her son was evaluated on September 22, 2017, in the wake of

12   his treatment request.  Even had she spoken with Borges and told her that Decedent

13   was suicidal, there is absolutely no evidence that anything else would have been done

14   besides the evaluation that Defendants performed anyway.

15         Plaintiffs' other arguments are equally unavailing.  As detailed in the preceding

16   section, Defendant Morris did follow County protocol in checking Decedent's status

17   during the hours before his suicide.  In addition, there was no indication that Decedent

18   should have been placed in a suicide-proof cell since he never identified being suicidal in

19   the first place.  In sum, then, there is no triable issue suggesting that either Borges or

20   Morris were negligent, and also no evidence that the Sheriff's Office was negligent for

21   any action or inaction of its own.[8]

22         **C.    Statutory Liability Under the California Government Code**

23         Plaintiffs' Third Cause of Action, like its negligence claim, similarly argues that

24   Defendants had "a duty to monitor, care for and respond" to pretrial detainees within

25         [8] To the extent that Plaintiffs argue that the ventilation grill in Decedent's cell should not have been
26   amenable to being used as a tie-off point for attaching a noose, it is undisputed that at the time of the
     subject incident the grill complied with applicable safety standards, since the Jail's physical plant had been
27   found to be in compliance with applicable regulations by the Board of State and Community Corrections on
     May 30, 2017.  UF No. 72.  In addition, prior to Decedent's death, no inmate had hung himself from a
28   ventilation grate in any event.  UF No. 71.  Therefore, the Sheriff's Office cannot be negligent due to the
     presence of the grate either.

1    their custody, and as with the Second Cause of Action it is directed to Defendants

2    Borges, Morris, and the San Joaquin County Sheriff's Office.  The difference is that

3    instead of being rooted in common law negligence, the Third Cause of Action purports to

4    be premised on the provisions of California Government Code §§ 845.6 and 844.6.

5    Section 845.6, while providing that neither a public entity or its employee is ordinarily

6    liable for failure to provide a prisoner with medical care, both may in fact incur liability if

7    "the  employee knows or has reason to know that the prisoner is in need of immediate

8    medical care and he fails to take reasonable action to summon such medical care. . . "

9    California courts have made it clear that any such liability is limited "to serious and

10   obvious medical conditions requiring immediate care."  Watson v. State of California,

11   21 Cal. App. 4th 836, 841 (1993).  Section 844.6 more generally states that while "a

12   public entity is not liable for . . . an injury to any state prisoner" that does not preclude a

13   finding of liability for a public employee's negligence.

14        The reasoning employed above in granting summary judgment as to Plaintiffs'

15   negligence claim, and to their claim that Defendants were deliberately indifferent in

16   failing to attend to Decedent's serious medical need.  Given Decedent's consistent

17   denial of suicidal ideation on multiple occasions through his booking process and during

18   his mental health evaluation on September 22, 2017, no identified "serious and obvious

19   medical condition" had been identified, let alone a failure to immediately respond to that

20   need.  Summary judgment is also granted as to the Third Cause of Action.

21        **D.    Entity Liability under Monell**

22        Plaintiffs' final Fourth Cause of Action asserts municipal and supervisorial liability

23   against both San Joaquin County and the San Joaquin County Sheriff's Office.[9]

24   Plaintiffs argue that Defendants ratified a course of conduct, and made it "tantamount to

_____

25        [9] Plaintiffs do not distinguish between the claimed liability of the County on the one hand and the
26   Sheriff's Office on the other.  This is not surprising since the FAC makes it clear, at least with respect to
     operation of the Jail, that the Sheriff's Office is a County agency and subject to its control.  FAC, ¶ 5.  That
27   characterization, in turn, is consistent with authority recognizing that sheriff's departments operate for
     counties when administering local prison policy, with the counties thereby "hold[ing] the ultimate power
     over the jails."  Streit v. County of Los Angeles, 236 F.3d 552, 561 (9th Cir. 2001).  Consequently, any
28   potential liability of the County and the Sheriff's Department in a case like this appears to be synonymous.

1    a custom, policy or repeated practice, of encouraging deliberate indifference to the

2    physical and mental well-being of inmates under their control."  FAC, ¶ 31.  As factual

3    support, Plaintiffs claim 1) that it is Defendants' standard practice "to do nothing when

4    notified by family members of detainees of the likelihood that the detainee could harm

5    himself"; and 2) that it is also standard practice for correctional officers working during

6    the night/early morning hours to deviate from "written department policy" when doing

7    counts and welfare checks of inmates in their cells.  Id. at ¶ 32.  Plaintiffs contend that

8    had these practices not been present and had correctional officers been properly

9    trained, Decedent's death could have been avoided.  Id. at ¶ 34.

10          Under Monell v. Dep't of Soc. Servs. of City of New York, "[l]ocal governing

11   bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive

12   relief."  436 U.S. 658, 690 (1978).  To establish municipal liability, the plaintiff must show

13   that a policy or custom led to the plaintiff's injuries and the policy or custom "reflects

14   deliberate indifference to the constitutional rights of its inhabitants."  City of Canton,

15   Ohio v. Harris, 489 U.S. 378, 385-92 (1989).  The case law, however, carefully

16   delineates so called Monell liability, which makes such an entity responsible for its own

17   illegal acts, from vicarious liability for the conduct of its employees under § 1983, which

18   does not attach.  Connick v. Thompson, 563 U.S. 51, 60-61 (2011) (quoting Pembaur v.

19   Cincinnati, 475 U.S. 469, 479 (1986)).  To constitute deliberate indifference, an entity's

20   shortcomings must be "obvious," with inadequacy "so likely to result in violation of

21   constitutional rights that the policymakers . . . can reasonably be said to have been

22   deliberately indifferent . . ."  City of Canton, 489 U.S. at 390.  Even if no explicit policy is

23   identified, a plaintiff may still establish municipal liability upon a showing of a permanent

24   and well-settled practice by the municipality that gave rise to the alleged constitutional

25   violation. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

26          Here, the County and Sheriff's Office had a policy of referring inmates for mental

27   health evaluation should any concern regarding suicide during the course of their

28   incarceration, and for purposes of the present case that concern may arise from

18

information provided by relatives like Ms. Taylor.  Correctional Health Care Services Policy 6.06, Ex. K to the Borges Decl.  Although Ms. Taylor claims she wanted to alert the Jail's mental health staff about her son's suicidality and states she attempted to call on multiple occasions, the fact remains that Cindy Borges did return one of Ms. Taylor's calls.  Since Taylor and Borges never ultimately spoke, however, Borges was not informed of any such tendencies on Decedent's part.  Borges' unsuccessful exchange of phone calls with Taylor does not demonstrate an unconstitutional policy or practice or Monell liability on the part of the County or Sheriff's Office.

Even if Taylor had successfully conveyed information about her son to Borges, Decedent himself requested mental health care and during an evaluation the very next day specifically denied any suicidal tendencies.  There is no evidence that any other course of action would have been taken given those denials, and the measures Jail staff took were neither deliberately indifferent nor inconsistent with County policy under the circumstances.  Additionally, in order to incur liability under 42 U.S.C. § 1983 on a Monell theory, Defendants' alleged policy or practice must have been the "moving force of the constitutional violation."  Polk County v. Dodson, 454 U.S. 312, 326 (1981).  Given the intervening September 22, 2017, evaluation that occurred after Taylor tried to call, and Decedent's express denials of any suicidality in the course of that evaluation, there is simply no evidence that any information Taylor provided would have led to a different result.

Plaintiffs have also adduced no admissible evidence whatsoever that the Jail ignored inmates' risk of suicide in other instances so as to suggest a policy or practice of deliberate indifference to such risk for which the County can incur liability under Monell.  While true that other inmate suicides in the Jail have occurred, that fact alone does not suggest that this was occasioned by the County's deliberate indifference.  As defense expert James Sida indicated at his deposition, suicides in County jails occur at three times the corresponding rate for the general population at large, and some 93 percent of jail suicides are effectuated by hanging.  Sida Dep, 152:2-14.

1    With respect to Plaintiffs' claim that it was "standard practice" for correctional

2    officers working in the nighttime hours to not properly verify that inmates were in their

3    bed and moving, there is again no evidence that this occurred in the present case.

4    County policy requires that such verification occur only in the context of an informal

5    count, and the only such count that occurred during the four hours prior to Decedent's

6    suicide (when Defendant Morris was monitoring Housing Unit 5) was mandated by

7    County policy to occur at 2:00 a.m.  Morris Dep., 12;1 10-11.  The evidence indicates not

8    only that Morris performed the requisite count at 2:01 a.m., but that he also saw

9    Decedent's flesh/movement at that time.  Tibon Decl., ¶ 27, Morris Dep., 22:14-17.  Also

10   consistent with County policy were the hourly welfare checks that Morris performed on

11   four other occasions during the shift in question.  The only "evidence" that Plaintiffs offer

12   to suggest that the counts/checks were not properly performed was a statement taken by

13   another inmate and included within the Incident Report prepared as a result of

14   Decedent's suicide.  While the inmate in question, Luis Candido, expressed his belief

15   that "some" correctional officers do not look into cells when conducting their checks, his

16   statement to that effect in the Incident Report amounts to unauthenticated hearsay and

17   cannot be relied upon in opposing summary judgment.   See., e.g., Carrasco v. Metro

18   PD, 4 Fed Appx. 414, 416 (9th Cir. 2001).[10]

19   Given all of the above, Plaintiffs' Fourth Cause of Action also does not survive

20   summary judgment.

21   ///

22   ///

23

24   [10] While Plaintiffs also cite to a prior order from this court in Lum v. County of San Joaquin, Case No. 2:10-cv-1807-LKK-DAD (ECF No. 107) that case is distinguishable from the case at bar because the correctional officer there falsely stated he had checked on the Decedent every 15 minutes and made log entries accordingly when in fact he had not done so.  In the present case, on the other hand, there is no dispute that Morris did the checks recorded electronically, the only issue is whether those checks were adequate.

26   The Court notes that Defendants have filed formal objections to certain evidence offered by Plaintiffs, including their submission of portions of the Lum order delineated above.  Some of those objections have been addressed elsewhere in this Memorandum and Order.  To the extent they have not been ruled upon in that manner, the Court did not rely on the evidence in question and accordingly need not specifically rule on those remaining objections.

20

**CONCLUSION**

For the reasons just stated, Defendants' Motion for Summary Judgment (ECF No. 29) is GRANTED.[11]  The Clerk of Court is directed to enter judgment in favor of Defendants and to close the file.

IT IS SO ORDERED.

Dated:  November 15, 2021

_____
MORRISON C. ENGLAND, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[11] The Court recognizes the additional claim posited by Defendants Borges and Morris that they are entitled to qualified immunity to the extent any constitutional violation is present.  Because the Court has concluded that no such violation occurred, it need not address qualified immunity and declines to do so.